IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

VIA CHRISTI REGIONAL MEDICAL     )
CENTER, INC. and CECILLIA ARNOLD, )
                                  )
            Plaintiffs,           )
                                  )
v.                                )        Case No.  04-1253-WEB
                                  )        (Consolidated with
BLUE CROSS AND BLUE SHIELD OF     )        Case No. 04-1339-WEB)
KANSAS, INC.,                     )
                                  )
            Defendant.            )
_____)
                                  )
BLUE CROSS AND BLUE SHIELD OF     )
KANSAS, INC.,                     )
                                  )
            Third-Party Plaintiff, )
                                  )
v.                                )
                                  )
IMA OF KANSAS, INC.,              )
                                  )
            Third-Party Defendant. )
_____)

**<u>Memorandum and Order</u>**

This matter is before the court on a motion for summary judgment by defendant Blue Cross

and Blue Shield of Kansas, Inc. ("BCBS") and a motion to dismiss by third-party defendant IMA

of Kansas, Inc. ("IMA").  The case presents a number of difficult legal issues arising under the

Employee Retirement Income Security Act of 1974 ("ERISA").  For the reasons set forth herein, the

court finds that BCBS's motion for summary judgment should be granted as to plaintiff Via Christi's

claims, but denied as to plaintiff Cecillia Arnold's claims.  The court further finds that third-party

defendant IMA's motion to dismiss BCBS's third-party complaint should be denied.

I. *Background*.

In 2001, Chance Industries, Inc. ("Chance") was the sponsor of The Chance Employee Benefits Plan, an employee health and welfare benefit plan covered by ERISA, 29 U.S.C. § 1001 et seq. The Plan was self-funded. Chance entered into an agreement with BCBS in January of 2001 under which BCBS agreed to provide administrative services to the Plan, including the processing of beneficiaries' claims. In conjunction with the administrative agreement, Chance also purchased a "stop-loss" insurance policy from BCBS under which BCBS was required to pay individual claims under the Plan in excess of $50,000. The Plan was responsible for paying claims under that amount. The Stop-Loss Policy was in effect from January 1, 2001 to January 1, 2002.

In October of 2001, plaintiff Cecillia Arnold was pregnant and was admitted to Via Christi Regional Medical Center. Arnold's child, King Jameon Haskins III ("Haskins"), was born prematurely and required substantial medical care. The child was admitted to Via Christi on October 17, 2001 and was not discharged until March 19, 2002, with the total amount due for his care in that period being $647,996.26. The child's grandfather was an employee of Chance and was a participant in the Plan, meaning both the child and his mother were eligible for Plan benefits (including the care provided by Via Christi). Upon the child's admission, his father executed a consent form assigning to Via Christi any and all medical benefits payable to the patient from insurance.

In April of 2001, Chance filed a Chapter 11 bankruptcy petition. In connection with its plan of reorganization, Chance decided it would convert the employee benefit Plan from a self-funded plan to a fully insured plan for the 2002 period. Third-party defendant IMA, Chance's insurance broker, assisted Chance in evaluating its options in this regard. Chance also obtained information

2

from BCBS.  Chance thereafter secured a fully insured plan, underwritten by BCBS, which became effective January 1, 2002.  The policy period for the fully insured plan was from January 1, 2002 until January 1, 2003.  Because the Plan became fully insured as of January 1, 2002, Chance allowed the Stop-Loss Policy to lapse on December 31, 2001.

The costs associated with the care of Ms. Arnold and her son began when the BCBS Stop-Loss Policy was in effect.  But BCBS did not receive the bulk of the billed medical expenses pertaining to such care until after the Stop-Loss policy had expired.  Because Via Christi did not bill the Plan until after expiration of the policy, the Stop-Loss Policy did not cover those charges.

The plaintiffs' complaint alleges that BCBS had specific knowledge of the care being provided to Haskins by Via Christi but failed to advise Chance or the Plan of the large claim likely to result from such care, despite the fact that BCBS assisted and advised Chance concerning conversion of the Plan from a self-funded to a fully insured plan.  The plaintiffs further allege that Chance and the Plan were unaware at the time of the large claim.  Plaintiffs allege that on or about March 1, 2002, Chance received notice of a claim paid by BCBS on behalf of Ms. Arnold for the care she received at Via Christi, and that on or about May 14, 2002, it received notice from IMA of the claim by Via Christi.  According to the plaintiffs, after a partial payment by BCBS there remains due the sum of $509,935.74 to Via Christi.  Had the Stop-Loss Policy not been canceled, all but $50,000 of this amount would have been paid by BCBS under that policy.  Without the policy, the Plan was unable to pay the claim.

Plaintiffs Cecillia Arnold and Via Christi (as the assignee of Arnold's insurance benefits) claim that BCBS breached a fiduciary duty owed to Chance, the Plan, and to the Plan's beneficiaries by failing to adequately advise Chance and the Plan of the pending claim by Via Christi.  As a result,

they claim to have suffered a loss of $459,935.74, and they seek a judgment against BCBS in that amount.[1]

II. *Uncontroverted Facts as to Defendant BCBS' Motion for Summary Judgment*.

A. *Administrative Agreement and Self-Funded Plan*.

The court finds the following facts to be uncontroverted for purposes of defendant's motion for summary judgment.

1. On or about January 9, 2001, Chance, the employer of Arnold King, entered into a contract with BCBS to provide administrative services for the Chance Benefit Plan from January 1, 2001, to December 31, 2001.

2. At the time of the execution of the Administrative Agreement, the Chance Benefit Plan was a self-funded health and welfare benefit plan for Chance's employees.

3. Pursuant to the terms of the Administrative Agreement, Chance delegated to BCBS its authority to perform the services provided for in the Agreement. The Agreement provided in part: "To the extent that in the discharge of its duties BCBSKS is performing the functions of a fiduciary as defined in Section 3(21)(A) of ERISA, BCBSKS shall be a Named Fiduciary as that term is defined under Section 405(c) of ERISA. BCBSKS agrees to perform the following services on behalf of Company [Chance] and at the direction of Company's designated Plan Administrator:

A. Provide general administrative, accounting, data processing, cost control, marketing, claims processing, fiscal and other related services to Plan Administrator on the same basis and in the same

_____

[1] In ruling on defendant's prior motion to dismiss, the court held that ERISA preempted Via Christi's second claim, which was based on a theory of promissory estoppel. Doc. 25 at 17. The court also dismissed claims by Chance and the Plan on the grounds that they were not fiduciaries (insofar as these claims are concerned) and did not have standing to assert ERISA claims. *Id*. at 10-11.

4

manner as provided to plan sponsors and plan administrators of benefits plans whose benefits are underwritten by BCBSKS.

B.     Advise and assist in a consultative capacity with regard to benefits under the plan and any subsequent revisions of the Benefit Plan as may be deemed appropriate from time to time, including advice and assistance with respect to provisions relating to eligibility, effective dates, coverage and cessation of coverage under the Benefit Plan.

\*    \*    \*

O.     BCBSKS shall provide Plan Administrator with such claim or statistical information and underwriting and actuarial services as may be reasonably required by and legally provided to Plan Administrator.

4. [controverted].

5. There was no provision in the Agreement specifically requiring BCBS to monitor Via Christi's billing activities.

6. In addition, nowhere in the Agreement was BCBS given discretionary control to fund the Chance Benefit Plan as it deemed proper.

7. [controverted].

B. *Chance's Stop-Loss Insurance Policy.*

8. In conjunction with the Administrative Agreement, Chance purchased a stop-loss insurance policy from BCBS, which covered claims incurred and paid during the term of the Stop-Loss Policy and which reached a certain threshold for individuals and/or in the aggregate. For individual claims, that threshold was $50,000.

9. The Chance Benefit Plan was responsible for paying all claims up to the threshold amount established by the Stop-Loss Policy.

10. Under the terms of the Stop-Loss Policy, BCBS was responsible for covering only medical expenses incurred and paid while the Stop-Loss Policy was in effect.

11.  The Stop-Loss Policy was effective from January 1, 2001 to December 31, 2002.  It expired on January 1, 2002.

C.  *Transition to Fully Insured Plan*.

12.  On or about April 17, 2001, Chance filed for bankruptcy under Chapter 11 in the United States Bankruptcy Court for the District of Kansas.

13.  In light of its financial difficulties, Chance desired to stabilize its costs by changing from a self-funded employee benefit plan to a fully insured benefit plan.

14.  IMA of Kansas, Inc. advised and assisted Chance in deciding not to renew the Stop-Loss Policy for the 2002 policy period.  IMA's assistance included relating information solicited from BCBS regarding the probable monetary consequences of non-renewal of the Stop-Loss Policy.

15.  IMA further advised and assisted Chance in deciding to convert from a self-insured plan to a fully insured plan for the 2002 policy period.  Again, IMA advised Chance based in part on information obtained from BCBS.

16.  IMA acted as Chance's agent in obtaining a fully insured plan that would best serve Chance.

17.  As Chance's agent, IMA also was responsible for marketing Chance's fully insured plan to potential insurers.

18.  Ultimately, through IMA, Chance secured a fully insured plan, which was underwritten by BCBS, and said plan became effective January 1, 2002 and insured Chance for the policy period of January 1, 2002 to January 1, 2003.

19.  Because the Chance Benefit Plan became fully insured effective January 1, 2002, Chance allowed the Stop-Loss Policy to lapse on December 31, 2001.

20.  The fully insured policy for the 2002 policy period provided for expenses incurred and paid after January 1, 2002.[2]

D.  *Medical Treatment Provided by Via Christi.*

21.  At all times relevant to this action, because Mr. King was an employee of Chance and a participant of the Chance Benefit Plan, his daughter, Ms. Arnold, and his grandson, King Jameon Haskins III ("Haskins"), were beneficiaries of the Chance Benefit Plan.

22.  On or about October 17, 2001, Ms. Arnold, who was pregnant and having labor pains, was admitted to Via Christi despite the fact that her child was not yet full-term.

23.  On or about that same day, Ms. Arnold gave birth prematurely to Haskins.

24.  Due to the circumstances of Haskins' premature birth, he required substantial medical care and hospitalization.

25.  Haskins was not discharge from Via Christi until March 19, 2002.

26.  BCBS did not receive the billed medical expenses for Haskins until after Chance's Stop-Loss Policy had expired.

27.  BCBS provided a manual to health care providers such as Via Christi which contained instructions on filing claims.  Under the BCBS manual in effect during 2001 and 2002, "interim billings may be submitted 60 days after admission and at 60-day intervals thereafter, providing that we are first notified of the admission...."  Doc. 84, Exh. C.

28.  Via Christi claims it is owed medical expenses in the amount of $509,935.74.  The amount that would have been paid by BCBS under the Stop-Loss Policy had it not been canceled

---

[2] The parties apparently agree that Via Christi's claim for services was not covered under the fully insured replacement policy.

would have been $459,935.74.

E.  *Arnold's Assignment of Benefits from the Chance Benefit Plan.*

29.  Upon Ms. Arnold's admission to Via Christi, Mr. King executed an Admission Consent Agreement ("Assignment Agreement"), whereby he assigned to Via Christi any and all medical benefits payable from any policy of insurance insuring Mr. King and those people for whom he was responsible.

30.  The Assignment Agreement specifically states: "I [Mr. King] hereby assign to Via Christi any and all medical benefits payable from any policy of insurance insuring the patient or person responsible for patient's care ... to be paid directly to Via Christi to be applied to the charges for services rendered."

31.  The Assignment Agreement does not specifically state that it assigns rights related to a breach of fiduciary duty claim under ERISA.

F.  *Chance's Bankruptcy.*

32.  The Chance Benefit Plan did not pay Via Christi the amount it claims it is owed for having provided medical services to Ms. Arnold and Haskins in connection with Haskins' care.

33-35.  On July 8, 2002, Via Christi filed an application in the Bankruptcy Court for allowance of an administrative claim against Chance in the amount of $509,935.74, based on post-petition medical services provided to a person [Haskins] covered by the debtor's welfare benefit plan.  Chance objected to the claim.  On May 19, 2003, Chance and Via Christi submitted an agreed-upon order to the Bankruptcy Court under which they agreed that the claim in the amount of $509,935.74 "should be allowed, provided, however, that such administrative claim shall not be paid by debtors [including Chance], but, instead, to the extent it is paid at all, it shall be paid as a result

of claims asserted by Via Christi Regional Medical Center, Inc., the debtor ..., Arnold King and Cecillia King against Blue Cross and Blue Shield of Kansas, Inc...."  Chance also agreed to assist Via Christi in pursuing such a claim.  The Bankruptcy Judge approved the order and it was filed on May 19, 2003.

G.  *Plaintiffs' Statement of Additional Facts*.

1.  Chance filed its Second Amended Plan of Reorganization on April 12, 2002.  The Bankruptcy Court confirmed the Bankruptcy Plan with modifications on May 16, 2002.

2.  Under the terms of the Bankruptcy Plan, a new entity was created, Chance Rides Manufacturing, Inc. ("CRM"), and a large portion of Chance's assets and a portion of its liabilities were transferred to CRM.

Pursuant to the Bankruptcy Plan, Chance's insurance contract with BCBS (No. 96250) was assigned to and assumed by CRM.

3.  On July 1, 2002, pursuant to the Bankruptcy Plan, Chance terminated all of its employees and CRM rehired them.  Additionally, pursuant to the Bankruptcy Plan, the assets proposed to be transferred from Chance to CRM were transferred and the associated liabilities were assumed.

4.  As a result of the transfer of the assets and the termination of all of Chance's employees pursuant to the Bankruptcy Plan, there are no further unpaid claims against the Chance Benefit Plan other than the claim by Via Christi for the care it provided to Haskins.

5.  The Stop Loss Policy that Chance purchased when the Plan was self-insured was Chance's most significant asset to prevent a catastrophic loss to the Benefit Plan.

III.  _Discussion_.

BCBS argues it is entitled to summary judgment for a number of reasons.  First, it contends

that the assignment from the Arnolds to Via Christi did not include the right to sue for breach of fiduciary duty.  Even if the assignment could include such a claim, BCBS argues that any duty it had to track unpaid claims or to provide information to Chance was not fiduciary in nature, but was ministerial and did not involve the exercise of discretionary authority.  BCBS thus contends it was not a fiduciary insofar as the actions complained of are concerned.  Moreover, BCBS argues plaintiffs' claims are barred because ERISA does not allow a beneficiary to bring a breach of fiduciary duty claim for individual relief, but only for relief benefitting the Plan as a whole.  Next, BCBS argues the claim fails because the agreed-upon order from Chance's bankruptcy proceeding means the Plan no longer owes anything, and therefore has not suffered a recoverable loss under ERISA.  In a supplemental brief, BCBS also argues that Ms. Arnold's claim is barred because Via Christi is contractually prohibited from seeking recovery from Ms. Arnold pursuant to a limited Contracting Provider agreement between BCBS and Via Christi, such that Ms. Arnold suffered no loss or injury from BCBS's alleged breach of duty.  Lastly, BCBS argues the claims fail because plaintiffs seek only compensatory damages, and ERISA does not permit recovery of compensatory damages on a claim for breach of fiduciary duty.

The standards and procedures for summary judgment are well established. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Id.*;  Fed.R.Civ.P. 56(c).  A principal objective of the summary judgment rule is to isolate and dispose of factually unsupported claims. *Celotex*, 477 U.S. at 323-324.  A disputed fact is "material" for purposes of summary judgment if it might affect the outcome of the suit under the

governing law, and a dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Under Rule 56, the movant bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir.1998). This burden may be satisfied by pointing to an absence of evidence on an essential element of the non-movant's claim. *Id.* at 671 (*citing Celotex*,  477 U.S. at 325). Once the moving party carries this burden, the opposing party cannot simply rest upon the pleadings; it must come forward with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  At this stage of the proceedings, the court must examine the evidence on a motion for summary judgment in the light most favorable to the non-moving party.  *Jones v. Unisys Corp.*, 54 F.3d 624, 628 (10th Cir.1995).

A. Via Christi's Standing as Assignee.   BCBS first argues that Via Christi lacks standing because the assignment upon which Via Christi bases its claim merely assigned medical benefits, not a right to sue for breach of fiduciary duty.  Plaintiffs argue in response that the court already ruled (in its Order of March 3, 2005) that Via Christi has standing as an assignee to pursue the claim. Via Christi further argues that as the assignee of the right to receive benefits, it has derivative standing and the same rights as the beneficiary, including the right to pursue an action for breach of fiduciary duty.

In its Memorandum and Order of March 3, 2005, the court concluded that ERISA does not prohibit plan beneficiaries from assigning health care benefits due under an ERISA welfare benefit plan.  The court went on to reject BCBS's argument that Via Christi's claim was barred by a specific

11

anti-assignment provision in the Chance Benefit Plan.  The court noted that the plaintiffs might be able to show Via Christi's care to Haskins fell within the definition of a "Medical Emergency" under the Plan, thereby converting Via Christi into a "contracting provider" not subject to the Plan's anti-assignment clause.  Doc. 25 at 14.  Additionally, the court rejected BCBS's argument that Via Christi had failed to allege facts showing an injury to the Arnolds.  As such, the court denied BCBS's motion to dismiss Via Christi's breach of fiduciary duty claim on the pleadings.  By contrast, BCBS's current argument is based upon the language and scope of the particular assignment of benefits from the Arnolds to Via Christi.  The court's prior ruling did not address the scope of that assignment or whether it assigned the right to bring a claim for breach of fiduciary duty.

The assignment executed by Albert Arnold in favor of Via Christi included a provision entitled,  "DIRECTION TO PAY MEDICAL INSURANCE BENEFITS DIRECTLY TO MEDICAL CENTER AND ASSIGNMENT OF INSURANCE BENEFITS."  Doc. 64, Exh. 7.  The body of that provision included the following: "I hereby assign payment for the unpaid charges of physicians' services for whom the Medical Center is authorized to bill.  I understand and agree that I am responsible for any remaining balance not covered by insurance.  I promise to pay Via Christi any medical insurance benefits I receive which relate to or arise from hospital care which is the subject of this admission.  I hereby assign to Via Christi any and all medical benefits payable from any policy of insurance insuring the patient or person responsible for patient's care (including, but not limited to, Medicare, Medicaid, Blue Cross & Blue Shield and others) to be paid directly to Via Christi to be applied to the charges for services rendered."  It also provided: "To secure payment of the amounts due Via Christi for care and treatment provided to the patient, the undersigned ... hereby

grants to Via Christi a security interest in all healthcare insurance receivables." *Id.*

The problem with Via Christi's argument is that it ignores the specific language of the assignment. Like any other contract, the scope of the assignment depends foremost upon the language of the agreement itself. The specific language above assigned to Via Christi any and all "medical benefits payable from any policy of insurance," which clearly would include any insurance benefits due the Arnolds under the Chance Employee Benefit Plan. But the claim here is not for recovery of benefits due under the Plan or benefits payable under a policy of insurance. It is that BCBS committed a breach of fiduciary duty which caused the *absence* of insurance coverage for the Plan, thereby depriving the Plan and the Arnolds of a source of payment that would have otherwise been available. Such damages allegedly resulting from a breach of fiduciary duty cannot reasonably be construed as "medical benefits payable from [a] policy of insurance." And as BCBS points out, any doubt in this regard weighs against Via Christi: "Because an assignment of a fiduciary duty breach claim affects all plan participants, and unsuccessful claims can waste plan resources that are meant to be available for employees' retirements, these claims are not assigned by implication or by operation of law. Instead, only an express and knowing assignment of an ERISA fiduciary breach claim is valid." *Texas Life, Acc. Health & Hosp. Service Ins. Guar. Ass'n v. Gaylord*, 105 F.3d 210, 218 (5th Cir. 1997). Via Christi has not pointed to any language in the assignment that could reasonably be construed as assigning the right to pursue an action for damages caused by a breach of fiduciary duty.

Via Christi cites two cases in support of its standing argument, but neither of them affects the foregoing conclusion. In the first case, *HCA Health Services of Georgia, Inc. v. Employers Health Ins. Co.*, 240 F.3d 982, 991, *rehearing denied*, 254 F.3d 77 (11th Cir. 2001), an ERISA

beneficiary who underwent surgery made an assignment to the plaintiff medical center that transferred his right to recover the costs of the surgery under a group health policy issued by the defendant insurance company.  When the insurer allegedly failed to pay the full benefits due under the policy, the assignee-provider sued to recover the benefits.  In addressing that claim, the Eleventh Circuit rejected an argument that the assignee provider lacked standing, noting that a plan beneficiary could bring a claim under § 1132(a)(1)(B) and nothing in that section or any other ERISA provision prevented derivative standing based upon an assignment of rights from the beneficiary.  *Id.* at 991.  *See also Texas Life, Acc. Health & Hosp.,* 105 F.3d at 215 (allowing derivative standing to assignees of breach of fiduciary duty claims does not frustrate ERISA's purposes).  The fact that an assignment of the right to insurance proceeds is valid under ERISA, however, says nothing about the *scope* of the instant assignment or whether it can be construed as including the right to seek redress for the lapse of an insurance policy allegedly caused by a breach of fiduciary duty.  The second case cited by Via Christi likewise provides no assistance insofar as construction of the assignment is concerned.  In *Hermann Hosp. v. MEBA Medical & Benefits Plan,* 845 F.2d 1286, 1290 (5th Cir. 1988), the court found that nothing in ERISA precludes an assignment of health benefits (just as this court found in denying BCBS's motion to dismiss on the pleadings), but it sent the case back to the district court for further development because "we cannot determine on the appellate record whether [plaintiff] was an assignee."  *Id.*  In a subsequent appeal the Fifth Circuit found the plaintiff was in fact an assignee and that the assignment conveyed the right to seek payment for benefits covered under the plan.  *Hermann Hosp. v. MEBA Medical and Benefits Plan,* 959 F.2d 569, 573 (5th Cir. 1992).  Nothing in that decision, however, supports Via Christi's overly-broad assertion that "it has the same rights as the assigning beneficiary."  If anything, *Hermann* II

14

shows that the particular language of the assignment must be examined to determine what rights are conveyed. *See id.* at 573 (finding that language in the assignment reserving the assignor's right to sue for a denial of coverage did not affect the assignee's standing because coverage was conceded). In the instant case, the assignment conveyed to Via Christi any interest or title the Arnolds had in benefits payable under an insurance policy, but there is no evidence of an intent to convey the right to sue for a lapse in insurance coverage caused by a breach of fiduciary duty. *Cf. Texas Life, Acc. Health & Hosp.,* 105 F.3d at 219 ("There is no evidence in the record that the Plan Administrators expressly and knowingly assigned the fiduciary duty breach claims."). Accordingly, the court concludes that Via Christi lacks standing to assert a claim for breach of fiduciary duty, and that BCBS's motion for summary judgment against Via Christi on this claim should be granted.

B. Suit for Individual Relief vs. Relief on Behalf of the Plan.

BCBS next argues that plaintiff's[3] claim is barred because it seeks individual relief, and 29 U.S.C. § 1132(a)(2) and 1109(a) only allow a plan participant to bring an action to recover for losses to the plan as a whole. *Citing, inter alia, Alexander v. Anheuser Busch Co., Inc.*, 990 F.2d 536, 540 (10th Cir. 1993). BCBS argues the Plan suffered no loss; rather, plaintiffs' claim only "represents Via Christi's loss for providing services to Ms. Arnold and Haskins." Doc. 64 at 13. Noting that § 1109 provides a fiduciary may be liable to the plan -- not to individual beneficiaries -- BCBS argues that "[w]hile the allegations in the Complaint state that the Plan has suffered a loss, such language is a veiled attempt to hide what is solely an effort to seek individual recovery." *Id.* at 14. If plaintiff recovers, BCBS argues, any payments Ms. Arnold might receive "would not inure to the

---

[3] In view of the court's holding above that Via Christi lacks standing to assert the breach of fiduciary duty claim, the court will address defendant's remaining arguments only insofar as they pertain to plaintiff Cecillia Arnold.

benefit of the Plan or the Plan participants as a whole." *Id*.

Section 1132(a)(2) of Title 29 provides in part that a plan participant or beneficiary may bring a civil action "for appropriate relief under section 1109...." Section 1109(a) in turn provides in part that any person who is a fiduciary with respect to a plan who breaches any fiduciary duty imposed by ERISA "shall be personally liable to make good to such plan any losses to the plan resulting from such breach," as well as restoring to the plan any profits made through the use of plan assets, and "shall be subject to such other equitable or remedial relief as the court may deem appropriate." In *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134 (1985), the Supreme Court rejected a beneficiary's contention that § 1109 allowed an award of extra-contractual compensatory and punitive damage to a beneficiary arising from a fiduciary's improper handling of the beneficiary's claim. The Court noted that ERISA otherwise provided individual beneficiaries with specific remedies, including an action for benefits due or to clarify their rights under the plan (§ 1132(a)(1)), and it found that Congress did not intend to authorize remedies other than those specifically listed. Insofar as § 1109 was concerned, the Court said, the entire text of the statute showed that Congress did not intend that section to authorize any relief except for relief to the plan itself. *Id*. at 147.    In a later case, *Varity Corp. v. Howe*, 516 U.S. 489 (1996), the Court examined section 1132(a)(3), which allows a plan participant or beneficiary to obtain an injunction against any act that violates ERISA or the plan or "to obtain other appropriate equitable relief" to redress such violations or  to enforce ERISA or the plan. The plaintiffs in *Varity* were plan beneficiaries who claimed that the plan administrator, through trickery, caused them to withdraw from the plan and to forfeit benefits. The plaintiffs sought (among other relief) an order effectively reinstating them as participants. The Supreme Court found that § 1132(a)(3), unlike § 1132(a)(2)

and § 1109, does authorize *individualized* equitable relief for breach of fiduciary obligations.

At first glance it appears this claim is one for individual relief that would be prohibited by *Massachusetts Mutual Life*. Inasmuch as the Arnolds' claim for medical expenses was apparently the only outstanding claim not covered by either the stop-loss policy or the fully insured policy that replaced it, the Arnolds are the only participant/beneficiaries who stand to ultimately obtain payment if the request for relief is granted. But given the unusual posture of the claim, the court is persuaded that plaintiff has fairly alleged a loss to the plan itself and that plaintiff seeks relief for the plan as a whole within the meaning of § 1109. Significantly, this is not a case where a fiduciary determined that a beneficiary was not entitled to benefits or did something to make the beneficiary ineligible for benefits. There is no dispute that the Arnolds are entitled to benefits under the Chance Benefit Plan, including the payment of the Via Christi medical bill. The Chance Benefit Plan was and is legally obligated to pay this claim for medical expenses, and its failure to do so renders it potentially liable to the Arnolds under § 1132(a)(1). Against this background, plaintiffs allege that BCBS's breach of fiduciary duty caused a loss *to the Plan* by depriving it of an asset that would have otherwise been available to the Plan to pay the Via Christi bill. According to Ms. Arnold's complaint, the Plan is unable to pay the claim due to cancellation of the stop-loss policy. This constitutes a concrete economic loss to the Plan. *Cf. Mira v. Nuclear Measurements Corp*., 107 F.3d 466, 472-73 (7th Cir. 1997) (plan suffered no economic loss where a lapse in insurance coverage was cured by reinstatement and payment of all outstanding claims). If the Arnolds were to prevail on their § 1109 claim, BCBS would be required to "make good to [the] plan" the loss resulting from its breach, and the Plan's assets would be restored to what they would have been but for the alleged breach. This in turn would likely enable the Plan to pay the Arnolds' claim. So, contrary to BCBS's argument,

17

if the plaintiffs recover it will not "inure only to Plaintiffs' benefit."  Any payment ultimately received by the Arnolds would inure to the benefit of the Plan (as well as to the Arnolds) by reducing a substantial outstanding debt of the Plan.  *Cf. McDonald v. Provident Indem. Life Ins. Co.*, 60 F.3d 234, 237 (5th Cir. 1995) (no loss to the plan was shown where the breach resulted only in the payment of higher insurance premiums; such premiums effectively made the plan more likely to survive catastrophic claims).  The fact that only one participant/beneficiary ultimately stands to have its claim paid in this instance if the Plan's loss of insurance is "made good" does not remove the claim from the purview of § 1109.  *Cf. Kling v. Fidelity Mgmt. Trust Co.*, 270 F.Supp.2d 121, 126-27 (D. Mass. 2003).  The Plan itself suffered a loss, and the Plan as a whole would benefit from restoration of its assets so as to allow it to pay the Arnolds' outstanding claim.[4]  Such a claim falls within § 1109's purpose of preventing misuse or mismanagement of plan assets and providing a remedy to protect the plan itself from losses caused by breach of fiduciary duty.  *Cf. Barnes v. Golden Gulf Offshore, Inc.*, No. 87-2383 (E.D. La., Apr. 9, 1991) (Unpublished; text available in Westlaw, 1991 WL 55824) (fiduciary was found liable under § 1109 where its breach caused a termination of insurance coverage for ERISA benefits).

    C.  <u>Whether the Plan Suffered a Loss</u>.

    BCBS argues that even if the claim is on behalf of the Benefit Plan rather than Ms. Arnold individually, the Plan "has not suffered a recoverable loss" because Chance and the Plan are insolvent.  Doc. 64 at 15.  BCBS argues that "[w]here an employee benefit plan is no longer liable

---

[4] If the plaintiff were to otherwise prove her claim, the fact § 1109 limits relief to that which is for the Plan itself might prevent the court from ordering BCBS to pay or reimburse the Arnolds directly.  But it would not prevent the court from requiring BCBS to pay or reimburse the Plan, with such proceeds then dealt with by the Plan in accordance with its governing provisions.

for claims owed, the benefit plan has not suffered a loss sufficient to support a claim for relief under ERISA." *Id*. (*Citing Physicians Healthchoice, Inc. v. Trustees of the Automobile Employee Benefit Trust*, 988 F.2d 53 (8th Cir. 1993)).  BCBS contends the Plan is no longer obligated to pay the Arnolds' claim because of the Chance bankruptcy proceeding and the agreed-upon bankruptcy order. According to BCBS, in that order "Via Christi and the Chance Benefit Plan specifically agreed that while Via Christi could maintain an administrative claim, the Plan was not liable for any amounts owed." Doc. 64 at 16.  As plaintiff points out, however, the debtor in the bankruptcy proceeding was Chance Industries, Inc. (and its affiliates), not the Chance Employee Benefit Plan.  BCBS does not explain its contention that Chance's bankruptcy negated the legal obligation of the Chance Industries Employee Benefit Plan to pay the Arnolds' claim for benefits.  For example, the agreed-upon bankruptcy order approved by Via Christi and Chance Industries provided that Via Christi's claim would not be paid by "the debtors" -- i.e., Chance Industries, Inc. -- but there is nothing in the order that purports to alter the Benefit Plan's legal obligation to pay the Arnolds' medical expenses. *See Antoniou v. Thiokol Corp. Group Long Term Disability Plan*, 849 F.Supp. 1531, 1534 (M.D.Fla.1994) (holding that employer and Plan were separate legal entities, and that release of employer did not release disability plan).  The court thus cannot accept defendant's argument that because of the bankruptcy order the Plan suffered no loss. *See* 29 U.S.C. § 1132(d)(1) & (2) (plan may sue or be sued as an entity; any money judgment against a plan shall be enforceable only against the plan as an entity and shall not be enforceable against any other person unless liability against such person is established in his individual capacity under ERISA).

BCBS adds two additional arguments in its Reply Brief.  First it argues the Benefit Plan was a third-party beneficiary of what it calls the "Bankruptcy Order agreement" and, as such, it contends

the Plan could enforce that agreement and prevent any recovery by Via Christi in the event it were to sue the Plan.  Defendant argues this shows that the Plan suffered no loss.  Again, however, defendant's argument fails to distinguish between the liability of Chance and the liability of the Benefit Plan.  Whatever effect the Bankruptcy Order may have had on the liability of Chance Industries, it does nothing to eliminate the Plan's liability to pay the Arnolds' medical expenses. The Plan thus cannot be considered a third-party beneficiary of the order.  BCBS additionally argues that Via Christi is "judicially estopped from denying the applicability of the Bankruptcy Order" because it represented to the bankruptcy court that it would not pursue any claim against Chance. The Chance Benefit Plan, however, was not a party to the bankruptcy nor a party to the order. Again, absent a showing that the bankruptcy eliminated the debt of the Plan itself -- which has not been shown -- the court cannot find that the Plan suffered no loss from the absence of insurance coverage.  In short, BCBS has not established that the Plan "is no longer liable for" the Arnolds' claim or that it has not suffered a loss.  Accordingly, BCBS is not entitled to summary judgment on this basis.

D.  <u>Whether the Relief Sought by Plaintiffs is Recoverable Under ERISA</u>.

BCBS also contends it is entitled to summary judgment on the grounds that plaintiffs are seeking compensable damages which are not recoverable under ERISA.  BCBS argues that ERISA only permits a court to award equitable relief, and that the essence of the plaintiffs' claim is for recovery of monetary damages.  *Citing Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 135 (1985) (beneficiary could not obtain extra-contractual damages under § 1109); *Callery v. United States Life Ins. Co. in the City of New York*, 392 F.3d 401, 409 (10th Cir. 2004) (compensatory damages are not "appropriate equitable relief" under § 1132(a)(3)).

20

The court disagrees with this argument for reasons previously indicated -- namely, because plaintiff may be able to show that a breach of fiduciary duty by BCBS caused a loss to the plan itself.  Section 1132(a)(2) provides that a participant, beneficiary or fiduciary may bring an action for appropriate relief under § 1109.  And section 1109, unlike § 1132(a)(3), is not strictly limited to equitable restitution or other "appropriate equitable relief" of the sort discussed in *Sereboff v. Mid Atlantic Med. Serv., Inc.*, 126 S.Ct. 1869 (2006).  Rather, section 1109 provides that a fiduciary with respect to a plan who breaches an obligation imposed by ERISA "shall be personally liable to make good to such plan any losses to the plan resulting from ... such breach...."   Insofar as plaintiff Arnold seeks an order compelling BCBS to make good *to the plan* the loss allegedly caused by a breach of fiduciary duty, plaintiff may be able to show an entitlement to such relief under § 1132(a)(2) and § 1109.  Assuming plaintiff could prove the elements of her breach of duty claim, she could be entitled to an order directing BCBS to pay to the plan a sum equivalent to the loss caused by BCBS.  The prohibition on compensatory damages in § 1132(a)(3) would not apply to such a claim.

E.  Whether BCBS was an ERISA Fiduciary and whether it Breached Such a Duty.

BCBS contends as a matter of law it was not a fiduciary insofar as Chance's decision to change insurance plans was concerned.  It notes that in determining fiduciary status, the court must look at the particular activity being challenged, so the fact that BCBS was acting as a fiduciary as to some activities does not mean it was a fiduciary as to all matters.  Specifically, BCBS contends it had no fiduciary duty to monitor Via Christi's billing practices or to ensure that it timely billed the Plan for its services, nor did it have a fiduciary obligation to advise Chance of Via Christi's "late billing" or its request for preauthorization for its services.  Doc. 64 at 21-22 (*citing Hartford Fire*

*Ins. Co. v. E.A. Sween Co.*, 920 F.Supp. 1021 (D. Minn. 1996)).

Under ERISA a party is a fiduciary "to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A). Under these provisions, plan management or administration confers fiduciary status only to the extent the party exercises discretionary authority or control. *David P. Coldesina, D.D.S. v. Estate of Simper*, 407 F.3d 1126, 1132 (10th Cir. 2005). Discretion exists when a party has the power of free decision or individual choice. *Id*. By contrast, non-discretionary or ministerial functions, such as clerical services, do not require individual decision-making. *Id*.

Under the Administrative Agreement with Chance, BCBS agreed among other things to provide administrative, accounting, cost control, claims processing and other related services to the Plan Administrator; to "advise and assist in a consultative capacity with regard to benefits under the plan and any subsequent revisions of the Benefit Plan as may be deemed appropriate from time to time, including advice and assistance with respect to provisions relating to eligibility, effective dates, coverage and cessation of coverage under the Benefit Plan"; and to provide the Plan Administrator with such claim or statistical information and underwriting and actuarial services as may be required by the Plan Administrator. BCBS also agreed to advise Chance with respect to claims procedures. Although some of these activities are obviously clerical or ministerial in nature and would not involve discretion, agreeing to consult and advise the plan about benefits, revisions to the plan, and

provisions relating to eligibility, coverage and cessation of benefits could involve the exercise of discretionary responsibility pertaining to administration of the plan.  Such activities would require BCBS to use its judgment in assessing and advising Chance about matters that could significantly effect the plan and its benefits.  Here, plaintiff alleges that Via Christi breached a fiduciary duty by failing to adequately advise Chance and the Plan about Via Christi's pending claim.  Doc. 1, ¶ 29. The uncontroverted facts indicate that BCBS alone had knowledge of this outstanding claim by virtue of its responsibility for administering the Plan, and that it also had exclusive responsibility for pre-certification and case management decisions pertaining to the claim.  BCBS was aware of Chance's proposal to switch to a fully funded plan, and the uncontroverted facts indicate it undertook -- at least to some extent -- to advise Chance about the economic consequences of allowing the stop-loss policy to expire.  The record indicates that BCBS may have had exclusive possession of the information necessary to make an informed judgment on that issue.  The scope of BCBS's advisory role, when considered in the context of the Administrative Agreement -- under which BCBS agreed to become an ERISA fiduciary and assumed primary responsibility for many aspects of plan administration -- goes beyond the scope of ministerial duties or, as BCBS puts it, merely "keeping track of unpaid claims."  Insofar as BCBS agreed to serve as an advisor to Chance with respect to plan provisions relating to "coverage and cessation of benefits," BCBS may have assumed a fiduciary obligation to keep the Plan informed about the cessation of insurance coverage and how it would affect the payment of benefits.  *Cf. Hartford Fire Ins. Co. v. E.A. Sween Co.*., 920 F.Supp. 1021, 1026-27 (D. Minn. 1996) (no evidence that BCBS assumed any advisory role with respect to the plan).  *See Reich v. Lancaster*, 55 F.3d 1034, 1049 (5th Cir. 1995) (advisors may be fiduciaries if they exercise discretionary authority and control that amounts to actual decision

making power); *Miller v. Lay Trucking Co.*, 606 F.Supp. 1326, 1334-35 (N.D. Ind. 1985) (insurance agent who gave investment and other advice to the plan administrator was a fiduciary).   As the legislative history behind ERISA notes: "While the ordinary functions of consultants and advisors to employee benefit plans ... may not be considered as fiduciary functions, it must be recognized that there will be situations where such consultants and advisors may, because of their special expertise, in effect, be exercising discretionary authority or control with respect to the management or administration of such plan or some authority regarding its assets.  In such cases, they are to be regarded as having assumed fiduciary obligations within the meaning of the applicable definition." *Miller*, 606 F.Supp. at 1335 (quoting from House Conf. Rep. No. 1280, 93rd Cong., 2d Sess., reprinted in 1974 U.S. Code Cong. & Ad. News 4639, 5038, 5103).

Under the limited facts presented, the court cannot say BCBS is entitled to judgment as a matter of law for lack of fiduciary status.  BCBS may have had a fiduciary duty with respect to the plan insofar as it assumed a responsibility to advise and assist Chance concerning benefits and changes to the Plan.  Moreover,  plaintiff may be able to establish that BCBS breached such a duty by failing to adequately advise Chance and the Plan about the Arnolds' outstanding claim and its potential impact.  Under ERISA, a fiduciary must discharge his duties with respect to the plan solely in the interest of the participants and beneficiaries and "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character...."  29 U.S.C. § 1104(a)(1)(B).  BCBS's alleged failure to advise Chance about an outstanding claim with the potential to render the Plan insolvent could be found to be a breach of this duty.  *See Glaziers and Glassworkers Local 252 Annuity Fund v. Newbridge Securities, Inc.*, 93 F.3d 1171, 1181 (3rd Cir.

24

1996) ("[T]he duty to disclose material information 'is the core of a fiduciary's responsibility.'").

     F.  <u>Contract Provider Agreement</u>.

     BCBS also argues that its Contract Provider Agreement with Via Christi precludes Via Christi from seeking payment for its medical services from the Arnolds.   According to defendant, this means Ms. Arnold has suffered no loss, and without a loss Ms. Arnold "has suffered no injury and has no standing to maintain a claim under ERISA." Doc. 93 at 18.  In response, plaintiffs argue that the contractual limitation referred to is "premised upon payment actually being made as required by the contract," and that the agreement does not specify a remedy in the event of an insolvent plan. Doc. 83 at 15-16.  Plaintiffs further argue that a failure to pay the agreed benefits would amount to a breach of the agreement or a complete failure of consideration that would operate to relieve Via Christi from the contractual limitation.  Finally, plaintiffs argue that enforcement of such a limitation in these circumstances would undermine the fiduciary obligations imposed by ERISA and would allow BCBS to profit from its own mismanagement.

     The Contracting Provider agreement provides in part that the hospital agrees "to accept as payment in full for Covered Services, both from Blue Cross and Blue Shield as well as from Insureds (*to the extent that Insured deductible or coinsurance payments are required for any services received*), the payment allowance for such services set forth in Section IV." Doc. 75, Exh. A at 3.  In return, BCBS agrees that it "will reimburse the Hospital as follows for Covered Services," including reimbursement of 90% of the hospital's usual charge for inpatient and outpatient medical and surgical services provided. *Id*. at p. 4.  Also, "[r]eimbursement is limited to the benefits of the insured's individual contract." *Id*.  The Agreement further provides that the hospital is considered a Contracting Hospital under the terms of coverage of BCBS insureds only with respect to Covered

Services.  It is considered a non-contracting hospital for all other services in terms of coverage and modality of reimbursement.  *Id*. at 5.

The court is not persuaded that the Contract Provider agreement necessarily precludes any potential liability on the part of the Arnolds to Via Christi.  Plaintiffs correctly point out that the Provider Agreement's restriction against a hospital seeking payment from the patient is premised upon BCBS's reciprocal promise to reimburse the hospital for the allowable portion of its charges. BCBS made a partial payment here for Via Christi's services, but did not provide reimbursement for the vast majority of the  charges -- presumably on the grounds that the expiration of the stop-loss policy meant the Arnolds were no longer an "insured" under that policy.  The restriction on Via Christi seeking payment from a patient, however, appears to apply only with respect to an "insured," which is defined as "any person entitled to receive medical and/or surgical services pursuant to the terms of [BCBS] underwritten or administered contracts...."  This language suggests that Via Christi would not be bound by the restriction insofar as the Arnolds did not have BCBS insurance coverage for the services they received.  Via Christi has also raised a serious question as to whether it would be entitled to relief from the restriction given the absence of full payment from BCBS.

Ms. Arnold has alleged that Via Christi has made demand upon her for payment of $509,935.74.  Doc. 1, ¶ 23.  Under the circumstances, BCBS has not shown as a matter of law that Ms. Arnold could not be found liable to Via Christi for its services.  Accordingly, the court rejects defendant's argument that as a matter of law Ms. Arnold lacks standing to assert a claim.

G.  Conclusion.

The court agrees with BCBS that Via Christi's assignment from the Arnolds did not include the assignment of a right to sue for breach of fiduciary duty.  Accordingly, defendant's motion for

summary judgment will be granted with respect to Via Christi's claim.  As for Ms. Arnold's claim under § 1109, BCBS has raised a number of serious challenges to the claim, but the court finds that Ms. Arnold has standing and can properly assert a claim for loss to the Plan caused by BCBS's alleged breach.  The court further finds that plaintiff Arnold may be able to show that BCBS had a fiduciary obligation to apprize Chance and the Plan of the Arnold's outstanding claim and its potential impact on the Plan (including the presence or absence of insurance coverage for the claim).  Plaintiff may also be able to show that BCBS breached that obligation and that the breach caused a loss to the Plan.  If plaintiff is able to prove such matters, she may be entitled to relief requiring BCBS to make good to the Plan the loss caused by BCBS's breach.  Accordingly, the court concludes that defendant's motion for summary judgment as to Ms. Arnold's claim should be denied.

IV.  *Motion to Dismiss by Third-Party Defendant IMA*.

BCBS has filed a third-party complaint against Insurance Management Associates of Kansas, Inc. ("IMA"), claiming that to the extent BCBS is found to have breached any fiduciary duty, IMA rather than BCBS is responsible for any loss suffered by the plan.  BCBS's third-party complaint is brought under 29 U.S.C. § 1132(a)(3), and asserts that IMA's role as Chance's agent and advisor in connection with the switch to a fully insured plan rendered it a co-fiduciary along with BCBS. BCBS asserts three claims against IMA: first, a claim for common law ERISA indemnification, which argues that IMA is primarily liable for the loss and BCBS is entitled to equitable or implied indemnification if BCBS is found liable to the plaintiff; second, a claim for common law ERISA contribution, which asserts that IMA is obligated to reimburse BCBS for any sum attributable to IMA's conduct; and third, a breach of fiduciary duty claim under § 1109, which argues that IMA

is liable as a fiduciary to make good to the Plan any losses caused by IMA's breach of duty.

IMA moves to dismiss the third-party complaint under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. With respect to the first two counts, IMA argues a fiduciary has no implied or federal common law right of contribution or indemnity under ERISA. *Citing, inter alia, Aks v. Southgate Trust Co.*, 1992 WL 401708 (D. Kan. 1992) (declining to recognize an implied or common law claim for contribution among ERISA co-fiduciaries). Even if there is such a right, IMA argues it does not apply here because the plaintiffs have not alleged that BCBS is liable for any conduct of IMA under a vicarious liability theory or under a co-fiduciary theory pursuant to § 1105. As such, IMA argues, BCBS is not subject to joint and several liability and cannot claim a right to contribution or indemnity. IMA also contends BCBS's assertion that IMA caused the loss is in reality a challenge to the essential elements of plaintiff Arnold's claim, which requires the plaintiff to show that BCBS's conduct caused the loss. IMA argues that if the trier of fact were to find that the actions of BCBS and IMA both caused the loss, then BCBS would be liable only for the portion of the loss it caused. Doc. 73 at p. 14. Lastly, IMA argues that BCBS's third party claim is improper under Rule 14(a) of the Rules of Civil Procedure because it does not contain any theory by which IMA could be liable to BCBS for any portion of plaintiff's claim against BCBS. Because this claim is not derivative of the plaintiff's claim against BCBS, IMA argues, it must be dismissed.

BCBS maintains that neither it nor IMA were acting as fiduciaries in advising the Plan about unpaid claims. But if the court finds BCBS was a fiduciary, BCBS argues that IMA was also a fiduciary and that it had equal or greater responsibility than BCBS. It argues that any loss should therefore be attributed to IMA. BCBS notes that the Tenth Circuit has not decided whether a right to contribution or indemnity exists among co-fiduciaries under ERISA, but at least two other circuits

have recognized such claims.  BCBS argues this court should not adopt the reasoning of *Aks v. Southgate Trust Co.*, supra, and it contends an examination of the factors in *Cort v. Ash*, 422 U.S. 66 (1975) weighs in favor of recognizing an implied right of contribution.  It contends that such a right would further ERISA's ultimate purpose of ensuring that beneficiaries receive the benefits they have been promised.  BCBS notes that a right to indemnification or contribution among co-fiduciaries has long been a part of trust law, and the court is permitted to resort to principles of trust law to fill in gaps in ERISA.  *Citing Emmons v. Equitable Life Assurance Soc. of U.S.*, 799 F.Supp.1123 (D.N.M. 1992) (finding fiduciary's right to indemnification was both implied in ERISA and part of federal common law of trusts).

On a motion to dismiss pursuant to Rule 12(b)(6), the purpose of the motion is to test the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true.  *Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir.1994).  The issue is not whether the plaintiff will ultimately prevail, but whether he is entitled to offer any evidence to support the claims.  *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974).  Under the limited review applicable at the pleading stage, a complaint may not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.  *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).  In making this determination, all well-pleaded facts in the complaint-as distinguished from conclusory allegations-must be taken as true.  *See Swanson v. Bixler*, 750 F.2d 810, 813 (10th Cir. 1984).

In keeping with the foregoing standard, the court assumes for purposes of the instant motion that BCBS could prove its allegation that IMA was a fiduciary with respect to the Chance Benefit Plan.  BCBS suggests in its brief that IMA would necessarily be a fiduciary if the court were to find

29

that BCBS had a fiduciary duty to inform the Plan about the effect of the Arnolds' claim.  The court notes, however, that IMA may have been situated differently than BCBS, given BCBS's agreement to undertake various tasks specifically for the benefit of the Chance Benefit Plan.  *Cf. Reich v. Rowe*, 20 F.3d 25, 32 (1st Cir. 1994) ("[W]e are concerned that extending the threat of liability over the heads of those who only lend professional services to a plan without exercising any control over, or transacting with, plan assets will deter such individuals from helping fiduciaries navigate the intricate financial and legal thicket of ERISA.").

As the parties point out, this area of ERISA law is unsettled, with two circuit courts allowing implied or common law claims for contribution and one circuit court rejecting such claims.  *See Free v. Briody*, 732 F.2d 1331, 1337 (7th Cir. 1984) ("In our opinion ERISA grants the courts the power to shape an award so as to make the injured plan whole while at the same time apportioning the damages equitably between the wrongdoers.");  *Chemung Canal Trust Co. v. Sovran Bank/Maryland*, 939 F.2d 12 (2nd Cir. 1991) (the traditional trust law right to contribution must be recognized as part of ERISA).  *But see Kim v. Fujikawa*, 871 F.2d 1427, 1432 (9th Cir. 1989) (section 1109 only establishes remedies for the benefit of the plan; therefore it cannot be read as providing for equitable contribution in favor of a breaching fiduciary).  The Tenth Circuit has yet to address the issue.  District courts within the Tenth Circuit are similarly divided, with the *Emmons* decision from the District of New Mexico approving of implied contribution claims and Chief Judge Lungstrum of the District of Kansas rejecting them in his 1992 *Aks* opinion.

Both parties rely on *Cort v. Ash* to support their arguments.  *Cf. Chemung Canal Trust Co.*, 939 F.2d at 15 (*Cort v. Ash* is "an inappropriate tool" for determining whether contribution should be implied).  In *Cort v. Ash*, 422 U.S. 66 (1976), the Court identified the following relevant factors

for determining when a private remedy should be implied in a statute: 1) whether the plaintiff is one of the class for whose special benefit the statute was enacted; 2) whether there any indication of legislative intent to create such a remedy or deny one; 3) whether implying the remedy is consistent with the underlying purpose of the legislative scheme; and 4) whether the action is one traditionally relegated to state law, such that it would be improper to infer a federal cause of action.  *Id.* at 78.

Like seemingly everything else having to do with ERISA, application of this test produces mixed results.[5]   The first factor generally weighs against recognition of an implied right of contribution, given that ERISA's primary purpose is to protect  plan beneficiaries rather than fiduciaries.  *See David P. Coldesina, D.D.S. v. Estate of Simper*, 407 F.3d 1126, 1136 (10th Cir. 2005).  *But see Free v. Briody*, 732 F.2d at 1337 ("Congress [also] intended to protect trustees from being ruined by the actions of their cofiduciaries, both because the language of ERISA provides protection for co-trustees and because Congress evidenced an intent to apply general trust principles to the trustee provisions of ERISA.").   The second and third factors might be said to weigh against recognition of implied contribution, because "[t]he six carefully integrated civil enforcement provisions found in § 502(a) of the statute as finally enacted ... provide strong evidence that Congress did *not* intend to authorize other remedies that it simply forgot to incorporate expressly." *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 146 (1985).  Congress also adopted a

---

[5] The court notes IMA's argument that this court should follow Chief Judge Lungstrum's *Aks* opinion because no purpose will be served if every judge with this type of case should "immediately woo the Muse and set down a lengthy opinion having the same 50-50 chance of being right."  Doc. 95 at 4 (citing *Equal Emp. Opportunity Comm. v. Pan American World Airways*, 576 F. Supp. 1530 (S.D.N.Y. 1984)). Judge Lungstrum's opinion is indeed well-reasoned, as IMA argues, but the court is persuaded by the opposing viewpoint that contribution furthers ERISA's purposes by treating breaching fiduciaries according to their relative culpability.  And when it comes to the thicket of ERISA litigation, the court would gladly settle for a 50-50 shot at being correct.

specific provision in ERISA limiting a fiduciary's liability for the breach of a co-fiduciary (§ 1105), and nothing in that section or in § 1109 mentions or suggests a right of contribution. On the other hand, a right of contribution may be viewed as a supplemental equitable device for apportioning responsibility among defendants rather than a civil enforcement action of the type Congress had in mind when it authorized remedies under § 1132. *See Chemung Canal Trust*, supra. Moreover, the Supreme Court has noted that the common law of trusts offers a starting point for analysis of ERISA unless it is inconsistent with the language of the statute, its structure, or its purposes. *See Harris Trust and Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 250 (2000). And under the common law of trusts, there was undoubtedly a right of contribution among co-trustees, at least in specified circumstances, where the co-trustees were jointly liable for having caused a loss to the trust. *See Restatement (Second) Trusts*, § 258 (Am. Law. Inst. 1959). As for the fourth *Ash* factor, it could be said to weigh in favor of a right of contribution, because Congress intended ERISA to pre-empt state laws and to make a uniform set of federal rules to govern rights and responsibilities relating to ERISA plans.

At common law, where more than one trustee was liable for a breach of trust committed by them jointly or for a breach of trust committed by one of them for which the others were liable, the trustees were jointly and severally liable to the beneficiary. *Restatement (Second) Trusts* § 258, comment a. In such a situation, the beneficiary could compel any one or more of them to make good the breach of trust. *Id.* If two such trustees were equally at fault, the trustee who made good the breach of trust could then compel the other to reimburse him for half of what the first had to pay. *Id.*, comment b. Where one of the trustees was substantially more at fault than the other, both were liable to the beneficiary but the one more at fault could not obtain contribution from the other. *Id.*,

comment d.  In that circumstance, the trustee who was less at fault was entitled to indemnity, and if he made good the loss he was entitled to contribution.  This rule permitting contribution was subject to certain exceptions -- such as for a breach committed in bad faith  -- but basically the remedy of contribution was available in cases of joint liability.

The cases above -- and numerous others -- identify a multitude of valid arguments pro and con on this issue.  The remedy sections of ERISA pertaining to breach of fiduciary duty are primarily focused on restoring the plan rather than obtaining equitable allocation among wrong-doing fiduciaries.  But nothing in these sections precludes contribution or even indicates an intent to preclude it.  The question largely boils down to whether Congress' silence should be interpreted as a rejection of contribution, *see Chemung Canal Trust Co.*, 939 F.2d at 18, or whether it is attributable to Congress' expectation that the courts would supplement ERISA's integral provisions with principles from trust law as necessary and appropriate.  The court concludes this is one instance where a matter not treated by ERISA should be supplemented by federal common law derived from the law of trusts.  The equitable allocation of responsibility among breaching fiduciaries was obviously a secondary concern to providing redress to protect plan beneficiaries, so its absence from the remedies approved by Congress does not, in this court's view, warrant an inference that Congress rejected this traditional remedy. *Cf. Mertens v. Hewitt Associates*, 508 U.S. 248, 254 (1993) (ERISA's explicit imposition of liability on co-fiduciary who knowingly participates in breach reflects a deliberate rejection of such liability for non-fiduciaries); *Smith v. Local 819 I.B.T. Pension Plan*, 291 F.3d 236, 240-41 (2nd Cir. 2002) (rather than explicitly enumerating all powers and duties of trustees, Congress invoked the common law of trusts to define the general scope of their responsibility).  Moreover, § 1109 subjects a breaching fiduciary to, among other things, "such

other equitable or remedial relief as the court may deem appropriate, ..." The court does not see how the availability of contribution in these circumstances undermines the purposes of ERISA, so long as contribution does not impede the plaintiff's ability to pursue a claim for relief against any breaching fiduciary.[6] Accordingly, the court concludes that ERISA permits a claim of contribution among fiduciaries who are subject to joint and several liability for a breach of a fiduciary duty.

If plaintiff Arnold were to prevail on her claim against BCBS, and if BCBS could establish that IMA was a co-fiduciary whose breach of duty caused in whole or in part the loss to the Chance Benefit Plan, then BCBS might be entitled to relief from IMA in the form of contribution or indemnity. IMA argues that no contribution should be available because plaintiffs have not alleged that BCBS is liable as a co-fiduciary with IMA. But the plaintiff has alleged that BCBS's breach caused the loss to the plan, and BCBS claims that IMA is liable to it for all or a part of that loss. Such a claim is properly asserted as a third-party claim. *See Alton Memorial Hospital v. Metropolitan Life Ins. Co.*, 656 F.2d 245, 250 (7th Cir. 1981) ("To be sure, where an ERISA plan suffers losses and where the plan participants and beneficiaries have established a cause of action on their own behalf or on behalf of the plan assets against one fiduciary, that fiduciary may seek indemnification or contribution from co-fiduciaries in accordance with 29 U.S.C. § 1105(a)."). Rule 14(a) permits a claim to be asserted against one "who is or may be liable" to the third-party plaintiff for all or part of the plaintiff's claim against the third-party plaintiff. At this point, based solely on the pleadings, the court cannot say BCBS could prove no set of facts in support of a claim of contribution or indemnity against IMA. Regardless of the fact that plaintiff Arnold did not sue IMA

---

[6] If it became necessary to do so, the court could defer issues pertaining to contribution until after resolution of the plaintiff's claim for relief under § 1109.

for the alleged loss to the Plan or claim that IMA was a co-fiduciary, BCBS could conceivably show that BCBS and IMA were co-fiduciaries jointly responsible for the alleged breach -- for example, by showing that IMA's alleged breach of duty enabled BCBS to commit a breach.  In such an event, BCBS might be entitled to relief on Count One or Two of its third-party complaint.  *Cf.* Wright, Miller & Kane, Federal Practice and Procedure, Civil 2d. § 1448 (Because the question whether someone is a joint tortfeasor is largely one of fact..., a motion to dismiss ... normally should be denied and the third-party plaintiff allowed an opportunity to produce evidence as to the nature of the relationship.").  Accordingly the court finds that IMA's motion to dismiss should be denied as to those counts.  Additionally, in view of the foregoing finding the court must also reject IMA's argument that Count Three should be dismissed because it is not a proper impleader claim under Rule 14.  Because BCBS has stated a proper claim for relief under Rule 14(a) in Counts One and/or Two of the third-party complaint, BCBS may properly join with it any other claim it has against IMA.  *See* Fed.R.Civ.P. 18(a); *First Golden Bancorporation v. Weiszmann*, 942 F.2d 726, 730 (10th Cir. 1991) ("Having brought a proper third-party claim, Rule 18(a) then allowed [defendant] to join 'either as independent or as alternative claims, as many claims, legal, equitable, or maritime, as the party has against an opposing party.'").

   V.  *Conclusion*.

   The Motion for Summary Judgment of Defendant Blue Cross and Blue Shield of Kansas, Inc. ("BCBS") (Doc. 63) is GRANTED IN PART and DENIED IN PART.  Defendant's motion is GRANTED with respect to the claims of plaintiff Via Christi Regional Medical Center, Inc.  Via Christi shall take nothing on its claims against defendant BCBS;  such claims are hereby dismissed on the merits.  Defendant's BCBS's motion for summary judgment is DENIED with respect to the

claims of plaintiff Cecillia Arnold.

The Motion to Dismiss of third-party defendant Insurance Management Associates of Kansas, Inc. (Doc. 72) is DENIED.

IT IS SO ORDERED this __29th__ Day of November, 2006, at Wichita, Ks.

s/Wesley E. Brown
Wesley E. Brown
U.S. Senior District Judge